373 So.2d 1149 (1979)
Roger Scott THOMAS
v.
STATE.
2 Div. 238.
Court of Criminal Appeals of Alabama.
March 27, 1979.
Rehearing Denied April 17, 1979.
As Amended May 8, 1979.
*1150 Thomas H. Boggs, Jr., Demopolis, for appellant.
William J. Baxley, Atty, Gen., and Linda C. Breland, Asst. Atty. Gen., for the State, appellee.
TYSON, Judge.
Roger Scott Thomas was charged in a two-count indictment under Alabama's Death Penalty Statute, § 13-11-2 through § 13-11-9, Code of Alabama 1975 (Act No. 213, General Acts of Alabama 1975), for the intentional killing of William Beville by shooting him with a shotgun while in the commission of a robbery. The jury found the defendant "guilty as charged in the indictment" and fixed punishment at death by electrocution. Thereafter, the trial court conducted a post-conviction hearing on the aggravating and mitigating circumstances, as required by law. The trial judge then set punishment at death by electrocution after making specific findings on the aggravating and mitigating circumstances.
*1151 At arraignment the appellant entered a plea of not guilty, and a special venire was summoned in addition to the regular venire. Appellant's attorneys made a motion for a psychiatric examination of the appellant at Bryce Hospital. The trial court then appointed three doctors to examine the appellant and to report back to the court their findings as to his mental competency and competency to stand trial, or if they found a reasonable ground that the appellant should be sent to Bryce Hospital and a lunacy commission appointed. After receiving the report from these doctors that the appellant was competent to stand trial and capable of understanding the charges and of cooperating with his attorneys, the trial court denied the request for further psychiatric evaluation.
A motion for a change of venue was denied following a hearing thereon, as was a motion to suppress the appellant's statement given to investigating officers.
During the voir dire of the venire, the appellant's attorneys challenged for cause one Robert Smith as a prospective juror. After further inquiry of Mr. Smith by the trial court, the appellant's challenge was overruled (Volume I, R. pp. 42-47).
Alabama ABC Agent Bobby Sewell testified that, on March 15, 1976, he investigated the reported death of one William Beville in Sumter County, Alabama, and that he was also acting as a deputy sheriff in this investigation. Sewell indicated that he accompanied Chief Deputy Wayne Cobb in a radio equipped car, in which they received a message about 7:00 to 7:30 on the morning of said date.
The two men proceeded directly to the trailer residence of William Beville, located on the Dr. Hester Circle Road, a dirt road leading to the Belmont community. When the officers arrived, the son of the deceased and the deceased's widow were present at the residence, as was the body of the victim, William Beville. The officers described the entrance door to the trailer as being a louvered type door through which you could see out if the louvers were open with a screen underneath. There were three steps leading to the front door, and just inside the door they found the body of William Beville "curled around the front door." The trailer residence was described as being ten feet wide. The officers observed a hole in the chest of the victim as he was lying on his side. The officers then radioed for Lt. Jones of the Criminal Investigation Division of the Alabama Department of Public Safety. They remained at the scene to assist Lt. Jones with his investigation and the taking of photographs.
On cross-examination Sewell stated that it was daylight when they arrived at the trailer residence, that when they examined the louvered door and screen they noticed a hole in the corner of the screen about two inches in diameter, that that portion of the screen was removed for examination, and there was blood under the body of the victim.
Lt. George H. Jones, Alabama Criminal Investigator with the Department of Public Safety, testified that he received a message on the morning of March 16, 1976, concerning a shooting in Sumter County, and that he drove over there and met ABC Agent Bobby Sewell and Chief Deputy Wayne Cobb at a ten foot wide trailer residence of one William Beville near the Belmont community. Lt. Jones then identified several photographs which he made that morning of the door, the body of the victim curled around the door, and a hole in the screen about two inches in diameter. Lt. Jones stated that the hole in the screen "was about midway of a seven foot door," and the louvers of the door were glass and were open. He stated that Beville had been shot through the chest and was dead and that rigor mortis had begun to set in. Jones further indicated that he was unable to pick up any usable fingerprints, and that he requested an autopsy, which was performed by Dr. Richard Roper, State Toxicologist. Jones further indicated that he received a wallet which contained a Medicaid card with William Beville's name on it from Mr. Anderson at the Sumter County Sheriff's Office, and that the wallet and piece of screen, which was removed from the screen *1152 door, were turned over by him to Dale Bloomer at the State Toxicology Lab in Selma. Jones stated he also found one live twelve gauge shell, which was also delivered to Bloomer. Jones then identified several photographs that he made that morning of the scene.
Tom Beville, son of the deceased, William Beville, testified that his mother and father lived in their trailer residence on Dr. Hester Circle Road near the Belmont community of Sumter County on March 14-15, 1976. He indicated he was present at his parents' residence when Officers Sewell and Cobb arrived and was also there when Lt. Jones came. He stated that he subsequently saw his father's body at Weatherly's Funeral Home before the funeral. Tom Beville then identified a wallet which had been on the person of his father the day before the shooting and a J. C. Higgins single barrel pump shotgun which was in the corner of a room in his parents' home the day before the shooting. He stated he did not see the shotgun the next morning when he arrived and that he found his father's body lying on the floor.
Dale Bloomer, Criminalist with the State Department of Toxicology, stated he was employed at the Selma, Alabama, Lab on March 16, 1976. He stated that he received a package from Lt. George Jones of the Department of Public Safety which contained a man's plaid shirt, a live Winchester, western .12 gauge Uplant shotgun shell, and a Playtex brand glove box containing one Playtex glove. He stated he went to Weatherly's Funeral Home and there received from Dr. Richard Roper an envelope containing a large mass of lead pellets and a small bag containing a black colored piece of granular material. Bloomer indicated that, on March 17, 1976, he received from Lt. Jones a piece of plastic screen, approximately 9" by 9" with a hole in it and also a wallet containing a Medicaid card bearing the name of William Beville.
In examining the plaid shirt, Bloomer described two holes, a small hole about 2" above the shirt pocket, and a larger hole in about the right center of the shirt which was approximately 1" in diameter. He stated that he examined the shirt for nitrites and found decomposed parts on the shirt which indicated that the muzzle of the gun that produced the blast had been relatively near the shirt at the time the weapon was fired, and that the hole also indicated from the blast pattern it was a regular barrel rather than a sawed-off barrel, which would spread the pattern of the shot. He identified the shell as being a No. 8 shot, .12 gauge, which he received from Lt. Jones. He also determined that the shots that he received from Weatherly's Funeral Home during the autopsy, at which he was present, were also No. 8 shots, and that he observed Dr. Roper removing the shots from the victim's body.
Bloomer also stated that he examined the piece of plastic screen, which had been brought to him by Lt. Jones, and performed certain tests on it, which determined there were nitrites and lead present on the screen. He stated that this indicated the muzzle of the shotgun was "quite near" at the time of the blast. Bloomer further stated that he examined the wallet, but it was wet at the time he received it and he could not obtain usable fingerprints and was not able to match any blood type on the wallet.
On cross-examination, Bloomer was asked his opinion as to the distance of the victim from the muzzle of the shotgun at the time of the blast, to which he replied, "Less than three feet."
Dr. Richard Roper, State Toxicologist, stated that he performed an autopsy at Weatherly's Funeral Home in York, Alabama, on the body of one William Beville. He described him as a well developed black male, about 5' 6" in height, weight between 120 and 125 pounds, and that his age had been stated to him as being 94. He stated that he removed No. 8 shotgun pellets from the chest of the deceased and determined that the middle section of the right lung was completely destroyed, the major arteries leading to the heart were also destroyed, that pellets were removed from the back of the body cavity near the backbone, *1153 and based upon his examination, death was the result of an acute hemorrhage due to a single shotgun wound to the body (Volume I, R. p. 89). Dr. Roper then identified a plaid shirt which he removed from the body of the victim and turned over to Dale Bloomer at the Funeral Home. Dr. Roper further indicated that he found small particles of the shirt in and about the fatal wound, indicating that the muzzle blast and lead pellets passed through the shirt before entering the body. This autopsy was done on the evening of Monday, March 15, 1976.
Craig Bailey, Criminalist with the Department of Toxicology, then identified Exhibits nine and ten, nine being the shirt, and ten being the shotgun shell, and stated that these had been in his custody since delivery to him by Dale Bloomer. Bailey then identified Exhibit eleven, which was the shots delivered to him by Dale Bloomer in the lab, and which were determined to be No. 8 pellets; and Exhibit fourteen, a .12 gauge Iver Johnson shotgun, delivered to him by Mr. Ed Billingsley, which was test fired and determined to be in good working order.
James R. Anderson, an employee of the Sumter County Board of Commissioners, stated that he was doing some landfill work for the County Commissioner on March 16, 1976, when he drove to the Belmont community area in his truck. He stated that he came to an intersection where some trash containers were sitting, and about 150' to 200' therefrom he found a wallet which was wet and contained a Medicaid card with the name of William Beville on it. He indicated that at this intersection the dirt road, known as the Dr. Hester Circle Road, commenced. He indicated that he called the Sheriff's Department and turned the wallet over to Deputy Ed Billingsley.
Dale Bloomer was then recalled and testified that particles of nitrite, caused by burning powder, are usually found in the wound if the gun is discharged close to the victim. Bloomer indicated that particles of nitrite were found and removed from the wound on the victim, Beville.
Echols Cook, an employee of McGregor Printing in Sumter County, testified that he had known the appellant, Roger Scott Thomas, casually for a year or two. Cook indicated he also knew the appellant's sister, Earline Thomas Rogers. Upon examination of a shotgun, Cook stated that one night, he could not recall the exact date, the appellant approached him and asked him if he wanted a shotgun, to which he replied, "Not necessarily." Cook indicated that Thomas then laid the shotgun on the car and told him he could have it if he wanted it. Cook stated that he had been doing some repair work on Earline Rogers' automobile when she asked him if he would carry the shotgun to his home, that she was afraid one of the children might get wounded with it. Cook stated that he then put the shotgun in his car and carried it to his home, then later turned it over to the Sheriff and Investigator Billingsley. He stated this was "about a year or two ago."
Earline Thomas Rogers stated that she was the sister of the appellant, Roger Scott Thomas, and that her husband was deceased. She indicated she was presently confined in Tutwiler Prison for Women, but in March, 1976, she lived in Sumter County, Alabama. Earline Rogers testified that, on March 13, or 14, 1976, she rode over to the Belmont community with her brother, Roger Scott Thomas, and one Scott Rhodes. She said that, when they went by the trailer residence of William Beville, Scott Rhodes engaged Beville in conversation. She said they noticed that Beville had a herd of approximately 150 goats, and that they were crossing the road. She said they were told that the herd belonged to William Beville, the old black man who lived in the trailer near the Belmont community. She said that Scott Rhodes told them "Beville was a wicked old man," that this took place on a Wednesday, and the following Saturday she and her brother, Roger Scott Thomas, drove back out by the Beville trailer in a green and white Mercury. She said that night they drove near the old man's trailer, and her brother said he wanted to talk to him. She did not remember her brother mentioning "a goat," and that by the time *1154 of this second trip it was dark. She stated that they parked the car on the side of the dirt road, got out, and began walking toward the Beville trailer. She said she stood at the foot of the drive and saw her brother go up toward the trailer, that he did have a conversation with someone at the trailer, which she could not overhear. When her brother returned, he told her, "The old man did not answer the door and told me to get away from his house." She stated her brother told her he was going to challenge the man, that this was on a Saturday night, and there was some mention of the old man "having some money." She testified that the appellant, Roger Scott Thomas, spent Saturday night and Sunday at her home. She said that the next day, Sunday, her brother told her that he wanted to go back out and talk to the old man. She stated that her brother wore dark pants and had on a green cap. She further stated that her brother took a shotgun and she carried a .22 pistol, that they left driving in the green and white Mercury about 8:00 to 8:30 p. m. to go to the Belmont community.
Earline Rogers stated that, on Sunday evening, they arrived at the trailer shortly after 8:30 p. m., and parked the car on the side of the dirt road below the Beville house trailer. She said the appellant told her to wait at the car for about ten minutes, and he got out, carrying the shotgun. She said that, in a few minutes, she got out, but that she never did get near the trailer. She said she could hear some voices, and in a few minutes she heard a "boom," like a shotgun (Volume I, R. p. 121). She said she waited, and, in a few minutes, she heard a noise like something had fallen, and heard her brother tell someone to "turn around." She then saw that it was the old woman and heard her brother tell her to cooperate or the same thing would happen to her. He was holding a shotgun on the woman, and told her to face the wall. She said the old woman had a coat over her head, and that she faced the wall away from her brother. She saw the body of a black man lying on the floor, he was not moving, and her brother told her to look around the trailer for money. She stated she went into the bedroom and bath, but did not find any money, but saw her brother getting a billfold, and later she saw him take, she thought, about $26.00 from the billfold, and that he also took a lady's watch, which he later gave to her. She stated she kept the watch from March until November, 1976, when she gave it to Sheriff Melvin Stephens. She said that a shotgun was in a corner, that her brother picked it up and brought it with him. She stated they were at the trailer about fifteen minutes, and her brother told the old lady not to move, for if she did he would come back and shoot her. She said that, after getting back in the car, they drove away, and her brother took the money and threw the billfold out near an intersection.
On cross-examination, Earline Thomas Rogers stated that nobody had threatened her to get her to testify, but she had been told, if she told the truth, her charge would be second degree murder. She also stated that she had talked with her lawyer before talking with the district attorney about testifying, and that she was the one who brought up the matter concerning testifying.
On cross-examination, Earline Thomas Rogers testified she was the mother of seven children, the oldest being fourteen, and they had been living with her on a housing project in Sumter County, Alabama. She said her parents had died when her brothers and sisters were very young, and they had been raised in foster homes since they were children. She said she was thirty-two, five years older than her brother, the appellant, Roger Scott Thomas. She said that, in March, 1976, her husband was dead, and she was on welfare and not working regularly. She denied that she carried the pistol to the Beville residence to be a lookout for her brother, and that her brother already had a shotgun, which he carried with him when they went out to the Beville trailer.
O. E. Billingsley III testified he was a district attorney investigator in March, 1976, and investigated the shooting death of William Beville. Mr. Billingsley stated that he was known as Ed Billingsley and had *1155 talked with the appellant, Roger Scott Thomas, in the Sheriff's Office concerning the case on November 20, 1976, after receiving a telephone message from the jailer that the appellant wished to talk with him. He stated that earlier he had been contacted by Florida authorities and had transported the appellant, on the Tuesday prior to Sunday, November 20, 1976, from Avon Park, Florida, to the jail at Sumter County, Alabama, that he was accompanied by Deputy Sheriff Tommy Walton. He stated that it took the two officers about twelve hours driving time to cover the distance from Avon Park to Livingston, Alabama. He stated that there was no discussion of the Beville case on the trip. Deputy Billingsley indicated that, on the night of November 20, 1976, when the jailer called him, the only people present were Sheriff Melvin Stephens, the appellant, and himself, and that, after talking with him, a Miranda rights card, which the appellant stated he understood and read over, and stated he understood fully his rights, was read to him. He stated that the appellant was not under the influence of drugs, alcohol, or any other disability at this time. Billingsley indicated that he made no offer, threat, hope of reward, or any inducement, or any type of intimidation in order to obtain a statement. He stated that he and the sheriff used a Sony tape recorder and made a tape of the conversation with the appellant, that they had previously tested the machine and found it to be in good working order. Specifically, Investigator Billingsley said that he asked the appellant if he wanted an attorney, Mr. Bob Upchurch, who was representing him in a case involving a robbery and two burglaries in Sumter County, to be there, and talk with him, while he was giving the statement concerning the death over at Belmont. He said the appellant replied that he did not want a lawyer present, that he wanted to talk with him voluntarily. The appellant then signed a waiver of his Miranda rights and signed a statement after a verbatim tape was made of the conversation.
The jury was excluded from the courtroom while the appellant's counsel made a voir dire examination of Deputy Billingsley concerning the circumstances of taking the statement and the taping of the statement by Investigator Billingsley and Sheriff Stephens on the Sony tape recorder. After determining that the appellant had been properly advised of his constitutional rights, and that there had been no threat, intimidation, hope of reward, or other inducement to obtain same, the trial court determined that the statement was "voluntarily obtained," and that the court would allow Deputy Billingsley to proceed with his testimony concerning the conversation (Volume I, R. p. 150).
Investigator Billingsley also testified that the tape was in his sole possession and had been after taking the appellant's statement except to turn it over to Pamela Wooldridge, secretary for the District Attorney's Office, who, at Billingsley's request, transcribed the tape, then turned the tape and the transcription over to him. He stated that he examined it to make sure there had been no changes, corrections, or erasures.
The trial court then had the tape played, and, after determining that it would exclude a portion of the tape which contained information with reference to another offense, admitted the Miranda waiver, the portion of the tape which pertained to the Beville shooting, and the statement given into evidence.
Investigator Billingsley stated that there was no conversation on the trip back from Florida concerning the Beville matter, but he did show Thomas a watch, and Thomas told him he did not want to discuss the matter. Billingsley said that was the extent of the conversation during the trip back from Florida. Billingsley then examined a photograph and a piece of plastic screen. He stated that he cut the portion of screen from the louvered door, that it was plastic material, not metal, and that he placed it in an envelope and delivered it to Criminalist George H. Jones of the Department of Public Safety.
On cross-examination, Billingsley stated he was present when Earline Thomas Rogers *1156 gave a statement in the law office of Mr. William Brewer, an attorney in Livingston, concerning the Beville shooting, and that Sheriff Stephens was also present. Billingsley indicated that the statement taken from Earline Thomas Rogers was obtained before bringing the appellant back from Avon Park, Florida, to Livingston, Alabama.
The appellant's statement, which is contained in the taped interview, was introduced into evidence (Volume I, pp. 172-181) and is hereby made Appendix A to this opinion as the same appears of record in Volume II, pp. 344-351.
It is noted that Investigator Billingsley admitted that he knew Attorney Bob Upchurch represented the appellant, but he did not contact him with reference to the interrogation of the appellant (Volume I, pp. 185 and 191). From this interview, it was learned that the appellant had left the weapon used in the Beville shooting with Echols Cook in York, Alabama, and there obtained a single barrel .12 gauge shotgun, which is State's Exhibit fourteen (Volume I, p. 186). Billingsley also indicated that he obtained a woman's watch from Earline Thomas Rogers while she was at the office of Attorney Brewer, her lawyer in Livingston, that he subsequently showed it to the appellant, and later it was admitted into evidence as State's Exhibit seventeen.
On redirect examination, Mr. Billingsley indicated that the appellant was on parole at the time of the Beville shooting.
Sheriff Melvin Stephens indicated he worked in the investigation of the death of William Beville, which occurred on or about March 16, 1976. He indicated that he went to the scene of the homicide and later was present when Deputy Ed Billingsley interviewed the appellant at the Sumter County Jail on November 20, 1976, which statement was taped and later transcribed by the secretary in the District Attorney's Office.
Sheriff Stephens indicated that two days later, November 22, he and Investigator Billingsley talked to the appellant the second time, and on this occasion the appellant told them to go see one Echols Cook, that there they could find out information about the weapon used. Sheriff Stephens stated they went to York, Alabama, and contacted Cook at McGregor Printing Company, and as a result they recovered the shotgun used in the homicide in question. Sheriff Stephens also indicated that the first time he saw the woman's watch, Earline Thomas Rogers had it, and she later turned it over to them.
At this point, by agreement of the parties, the taped interview, which had been transcribed and placed in evidence in that form earlier, was then played for the jury (Volume II, pp. 202-203). This is made Appendix B to this opinion.
Roger Scott Thomas stated that he was confined at the Sumter County Jail, having been there since November 15, 1977. He stated that prior to this date he had been incarcerated at the Florida State Prison at Avon Park, Florida, and had received penitentiary sentences in both Alabama and Florida previously. He stated that his father died when he was two, and his mother died when he was five, and that he had been placed in a foster home when he was six years of age. He stated that his sister, Earline Thomas Rogers was living in York, Alabama, with her children, and that he had been staying at her place in the housing project in March, 1976. Thereafter the appellant's testimony confirms his visits to the Belmont community and to the home of William Beville, as related in his statement, and in the taped interview.
The appellant testified, however, that he could not see inside the trailer when he went up there on the night of the shooting, that he wanted to explain to the man about some car trouble, that he heard the woman back away from the door, and he stuck the shotgun inside the louvered window on the door and fired. He stated that it surprised him quite a bit that he had shot anybody because he heard the woman's voice as she moved back away from the door. The appellant denied intentionally shooting William Beville, or knowing that he was at or near the door of his trailer at the time he fired the shotgun through the louvered door (Volume II, p. 210).
*1157 On cross-examination, the appellant admitted a conviction of robbery in Sumter County, Alabama, and a second conviction of robbery in Greene County, Alabama. Appellant also stated that he was convicted of second degree murder in Florida, which was in settlement of a case. He also stated that he had served an earlier sentence in the State of Mississippi. The appellant denied that he had any intent to kill William Beville and stated that he was first made aware about "old man Beville" through Scott Rhodes. He stated that when he realized he had shot the man, "he was really scared to death and was really upset." He admitted that he was two to three feet from the door when he fired the shotgun. He stated that he saw the wallet in the man's pants pocket, and that the pants were hanging on a chair when he removed the wallet.
The State then recalled Investigator Billingsley, who stated that he had a subsequent conversation with Roger Scott Thomas at the Sumter County Jail in either March or April, 1978. He stated that the appellant began the conversation by asking him if he were the man that "had no compassion, the man who had no feeling toward anyone." Billingsley indicated that he was having a conversation with another inmate at the jail, and the appellant spoke the second time and made the following comments (Volume II, p. 223):
"A. He had made the statements, you have no compassion, you have no feeling for a man, or anything, and he made the statement, you're trying to put me in the electric chair; trying to put me to death. I said, did you have any compassion on the old man when you shot him over there at Belmont. He said, old man was old, said, the old man was 90 years old. Everybody's got to die sometimes."
Thereafter the trial court gave an extensive oral charge, to which there was no exception taken.

I
The appellant contended through his attorneys at trial that the Alabama Death Statutes under which he was convicted were unconstitutional because the trial jury could not consider the aggravating or mitigation circumstances, thus, making the death penalty mandatory and violative of the Eighth and Fourteenth Amendments to the United States Constitution. This issue has been determined adversely to the appellant by the Supreme Court of Alabama, so we need to dwell no further on this point. Jacobs v. State, Ala.Cr.App., 361 So.2d 607 (1977), affirmed, S.Ct., Ala., 361 So.2d 640 (1978); and Evans v. State, Ala.Cr.App., 361 So.2d 654 (1977), affirmed, S.Ct., Ala., 361 So.2d 666 (1978).

II
The appellant asserts as error the trial court's denial of his challenge for cause of the venireman, Robert Smith. This colloquy, following questions asked by the State's attorney and the defense counsel, covers several pages and includes questions from the trial judge as well. The attorneys explained to the members of the venire that only two possible verdicts could be brought in under the Alabama Statutes (Volume I, pp. 40, 41), and when initially asked by the trial court, Venireman Smith, in response to the question, "If you had a question about the intent, is there anyone here that would find him guilty anyway" replied, "I believe I would probably find him guilty" (Volume I, p. 44). Appellant's counsel challenged for cause.
Counsel for the State then asked the following (Volume I, pp. 45-47):
"MR. WATKINS: That is one of the requirements and one of the essential elements in this case. Would you require the State of Alabama to prove to you beyond a reasonable doubt that his man intentionally killed the deceased? Would you make that requirement, which the Judge is going to tell you is the law?
"MR. SMITH: Yes.
"MR. WATKINS: Then, if you're not convinced beyond a reasonable doubt that he intended to kill the deceased, then you would be able to find him not guilty, would you not?
*1158 "MR. SMITH: Right. If clear cut.
"MR. WATKINS: All right. I would oppose the challenge for cause.
"MR. BOGGS: I still challenge for cause.
"THE COURT: Before I rule I want to ask you one more time, Mr. Smith. If the evidence were such that there was a reasonable doubt in your mind as to the innocence or guilt of the defendant, would you be able to return a verdict acquitting the defendant; that is, turning the defendant aloose, returning a verdict of innocence, if there was a reasonable doubt in your mind as to whether it was an intentional killing or not? If there was a reasonable doubt in your mind, would you be able to return a verdict finding the defendant not guilty?
"MR. SMITH: Yes, if it was a reasonable doubt; a clear reasonable doubt.
"MR. WATKINS: Semantics, Judge, reasonable doubt.
"MR. BOGGS: I know and such semantics, I think he ought to be challenged for cause for justice to be done, Your Honor.
"THE COURT: Based on Mr. Smith's answer that if there were a reasonable doubt in his mind that he would acquit the defendant, I'm not going to grant a challenge for cause in that particular case.
"MR. BOGGS: We except, Your Honor. Is there anyone on this jury panel that if you were the only one; if you were the only one, Mr. Smith, everybody else wanted to electrocute Roger Scott Thomas, you said, well, based on the evidence I'm not sure that he intentionally killed him. I believe that he killed him, but I don't believe that he intentionally did it, so I'm not going to vote to electrocute him; would you stay there for two days if necessary or would you go ahead and vote guilty, if you believed he shot him?
"MR. SMITH: I would follow my own.
"MR. BOGGS: What would that be?
"MR. SMITH: If the evidence showed that he didn't intentionally kill him, it would be not guilty.
"MR. BOGGS: All right. You're convinced of that?
"MR. SMITH: Yes, sir.
"MR. BOGGS: Does everyone else feel the same way?
"THE COURT: Let the record show that that last statement was made by Mr. Smith."
As may be seen in the above colloquy, prospective Juror Smith indicated that if he were not convinced that the appellant intentionally killed the deceased and he had a reasonable doubt, he would vote not guilty. Under these circumstances, we believe the trial court correctly overruled the appellant's challenge for cause. See Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776; and Davis v. Georgia, 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339.

III
The appellant challenges the admission into evidence of the appellant's statement made to Investigator Billingsley at the Sumter County Jail after a Miranda warning, but contends that the same should have been excluded because Deputy Billingsley admitted knowing the appellant was represented by counsel and yet proceeded to interrogate the appellant without contacting Mr. Upchurch, the attorney.
Judge Bowen, speaking for this Court in Alexander v. State, 370 So.2d 330, 1979, stated:
"`The fact that a defendant has an attorney does not mean, as a per se rule, that law enforcement officials cannot procure a statement of any kind from the defendant without prior notice to, if not the consent of, the attorney'. This rule was fully discussed and applied in Thompson v. State, 347 So.2d 1371 (Ala.Cr.App.), cert. denied, 347 So.2d 1377 (Ala.1977). In Brewer v. Williams, 430 U.S. 387, 97 S.Ct. 1232, 1243, 51 L.Ed.2d 424 (1977), the United States Supreme Court implicitly rejected any such `per se' rule."
As may be seen in examining the statement itself, as given to Investigator Billingsley by the appellant, and the deputy's Miranda warning, the voluntariness predicate, the appellant indicated that he was *1159 aware that his counsel could be present and would be called, but did not desire the presence of his attorney before conferring with Investigator Billingsley. There is no contention that there was any inducement or trick, or artifice, used, the record in this cause being to the contrary.
While this Court indulges every reasonable presumption against waiver of the right to counsel, and such must be affirmatively demonstrated, knowingly and intelligently, we find that, in accordance with the trial court's findings, such was here done. The appellant's constitutional rights were carefully protected, and there was no indication of any improper influence or suggestion whatever. Our conclusion is based upon the uncontradicted evidence that the appellant voluntarily waived this right.
The record is also clear that a full Miranda warning was given the appellant, and there was no improper influence, threat, intimidation, coercive factors, or other inducement made to obtain the statement. We hold that the trial court properly admitted the appellant's statement into evidence. Alexander, supra, and authorities herein cited.
Moreover, the appellant here took the stand and fully admitted his participation in the shooting death of William Beville on the night of March 14-15, 1976, in Sumter County. His sole contention appears to be that such was not done "intentionally." This was a factor for the jury's consideration, based upon all the evidence in the cause. Where, as here, the appellant has taken the stand and testified to essentially the same facts, as contained in "his confession," we cannot say that error should be ascribed to the admission of the statement in question. See Boulden v. State, 278 Ala. 437, 179 So.2d 20; and Jones v. State, 50 Ala.App. 36, 276 So.2d 621, and authorities therein cited.

IV
The appellant's counsel contends that reversible error occurred during the following colloquy (Volume II, p. 226) which occurred during closing argument in this cause:
"MR. BOGGS: I object to that. That's highly improper.
"MR. WATKINS: Your Honor, he opened it up. He eluded to the fact that he'd serve the rest of his life in the penitentiary and I feel I have a right to tell them what a short time.
"MR. BOGGS: I object, Your Honor. He's testifying now before you rule.
"THE COURT: Overrule the objection. He's replying in kind.
"MR. BOGGS: Your Honor, I think that is incorrect. I was not authorized ... now to testify as to the great number of years; now he's talking about the number of years until parole. It's highly prejudicial.
"MR. WATKINS: You said the rest of his life.
"THE COURT: Overrule your objection. He's replying in kind.
"MR. BOGGS: I object again, Your Honor. It's prejudicial and inflammatory.
"THE COURT: Sustained.
(Whereupon, the District Attorney concluded his closing argument to the jury, and with no further objections being made, the Court charged the jury as follows:)
As may be seen in the above colloquy, the trial court's final ruling was to sustain the appellant's counsel's objection to the alleged prejudicial argument.
No further ruling was made by the trial court, nor was there a request by way of motion to exclude, motion for a mistrial, or other request made of the trial court to clarify its ruling.
Further, the statements hereinabove quoted verbatim from the trial court's record are fragmentary, and thus their alleged prejudicial effect is not fully presented for our review. McClary v. State, 291 Ala. 481, 282 So.2d 384.
While we fully agree, and the law is clear, that the State's attorney may not argue to the jury certain prejudicial matters, Whisenhant v. State, 370 So.2d 1080, 1979, nevertheless, we are clear to the conclusion *1160 that a case for reversal has not been made by the colloquy herein quoted from the record in this cause.

V
We carefully note that the trial judge here conducted a post jury sentencing hearing and inquired into the aggravating circumstances, as well as the mitigating factors, established by the record in this cause. Section 6, Act No. 213, Acts of Alabama 1975 (§ 13-11-6, Code of Alabama 1975). Extensive findings were made by the trial judge, which are here made Appendix C to this opinion (Volume II, pp. 279-280).
The trial judge in his order noted the aggravating circumstances, which were here averred and proved at trial, and also determined by the trial judge in the post sentence hearing, as required by law. Additionally, this Court has carefully weighed the aggravating and mitigating circumstances independently.[1],[2]
We are of the opinion that the punishment here imposed fits the crime for which the appellant has been found duly guilty.
The judgment of conviction and sentence of death is in all respects
AFFIRMED.
All the Judges concur.

ON REHEARING

Opinion corrected; application overruled.
All judges concur.
BOOKOUT, J., concurs specially.
BOOKOUT, Judge, concurring specially:
I would not change the opinion as originally written. I concur that Cook, supra, prohibits "pecuniary gain" from being used as an aggravating circumstance where the charge is robbery when the victim is intentionally killed by the defendant. As the Supreme Court said, this in effect condemns the defendant twice for the same act stealing money.
The same rationale expressed in Cook, supra, applies to using the circumstance that the "capital felony was committed in the course of a robbery" to aggravate the offense of capital robbery. The two are the same thing, and thus the defendant is being condemned twice for the same actrobbery.

APPENDIX A
Q MR. WATKINS: (continuing) Go ahead.
A I asked the question: You have no objections to the fact that I record it, do you? Roger Thomas answer: No objection. I asked the question: Now, a moment or two ago before I got this tape recorder out, here on the table is a paper entitled, Statement of Miranda Rights and it states some 5 items and a line is drawn and you have signed it. These were read to you and you understand it, is that correct? Roger Thomas: Yes, sir. I asked the question: And, you signed this voluntarily without any offer or reward, or force, or threat, or anything else, is that correct? Roger Thomas: That's right. I asked the question: Then there is a waiver of these rights and you have signed there advising that you waive; and I advised you before you signed those that you did not have to .. that you do have an attorney, Mr. Bob Upchurch, who is representing you. I told you that I wanted to talk to you about the Beville death over in Belmont and you advised me that you were willing to talk about that, even understanding that you didn't want a lawyer present, is that correct? *1161 Right. Roger Scott answered: Right. I asked the question: And, you're doing this voluntarily without any force, or threat, or offer of reward, or inducement of any kind? Roger Thomas answered: Right.... I asked the question: And, you have signed in these two places; are your signature, is that correct? Roger Thomas answered: Yes, sir. I asked the question: I'm going... I am signing here where it says witness. You're seeing me sign at this time, is that correct? Roger Thomas answered: Yes, sir. I asked the question: Sheriff Melvin Stephens is here and hearing all that is said between you and I, is that correct? Roger Thomas answered: Yes, sir. I asked the question: You understand the last item here, that you can decide at any time to exercise these rights and not answer any questions or anything at all in connection with this. Do you understand that? Roger Thomas answered: Yes, sir. I asked the question: What do you want to tell me about it, Roger? Roger Thomas answered: Well, I'll just leave all the questions up to you. I asked the question: I understand that you and Earline went to a William Beville's trailer over at Belmont on a dirt road, back in March, March 14th, 1976, on a Sunday night, is this correct? Roger Thomas answered: Yes, sir. I asked the question: And, that ... when you went there you went with a shotgun, is that correct? Roger Thomas answered: Yes, sir. I asked the question: Did Earline go with a pistol when she went there? Roger Thomas answered: She had a rifle. I asked the question: Had a rifle? Was there anyone else with you when you went there? Roger Thomas answered: No, sir. I asked the question: And, you went in Earline's green Mercury or your white Buick? Roger Thomas answered: It was in her green Mercury. I asked the question: When in her green Mercury, when you went there, about what time of day or night was it, Roger? Roger Thomas answered: I'd say it was about 9:00, approximately 9:00. I asked: At night? Roger Thomas answered: Yes, sir. I asked the question: When you got there, what did you do? Who went ... now, this trailer, would you describe where the trailer was situated in relation to the road? Do you recall? Roger Thomas answered: Well, going to the fishing spot up there, it's on the right side of the dirt road; it's up on a bank on the right-hand side going. I asked the question: And, was it just a house trailer, or did it have any other kind of building or structure or anything around it, if you recall? Roger Thomas answered: Well, it had some sort of shed out in front of the trailer house. I asked the question: Okay. Had you been there the night before? Roger Thomas answered: Yes, sir. I asked the question: The night before had the man in the house told you to go on, or to leave, or something to this effect. Roger Thomas answered: Yes, sir, he said that he didn't have no phone or nothing like that that we could make a call. I asked the question: What had you gone there the night before for? What was the purpose of your going there? Roger Thomas answered: Well, we were intending to rob the man the first night there, but we couldn't get him out of the house, and that first night we didn't want to have to do no shooting up in the house, but our main purpose was to get the robbery done. And, so after he didn't come out of the house that first night, it seemed to us the only way we were going to get up in there was by shooting up in there and demanding. I asked the question: Forcing your way in? Roger Thomas answered: Yes, sir. And, so the second night we went there and uh I started to put the same questions to him about. I asked the question: What was some of these questions, please, sir? Roger Thomas answered: Well, like uh we had car trouble down the road with our car and we wanted to use the telephone to get a service truck out there; and those shoes, I don't know where that came in at. Roger Scott Thomas laughed. Then, I asked the question: You didn't ask about any shoes or didn't try to sell him ... tell him you had some shoes you wanted to sell? Roger Thomas answered: No, we didn't mention anything about shoes. I asked the question:
*1162 Was Earline up at the house with you? Roger Thomas answered: Well, uh she was around the side of the house at the time. I asked the question: Who came to the door on the Sunday night? Roger Thomas answered: Well, it was a woman come to the door at first, but she didn't answer, you know, she just ... when she saw me outside, she backed up from the door. I asked the question: Was there a television on, or were they up, or were they in bed, or do you know? Roger Thomas answered: There was a television on. I don't know whether they were in bed or not, except this woman, she was at the door. When she backed up she said something to the man that was in the house with her. You know that ... you know, and that's when I put the gun through the door and I shot inside and I guess he was standing, or had come out of the bedroom at the time; see, cause the bedroom is really not far from the door. I asked the question: Now, when you shot you said you put it through the door: describe that for me; how you did that? Was there a hole in the door or window there, or what? Roger Thomas answered: There was a roll in sort of roll in type. I asked the question: A louver where you open them up or close, like my hand is straight up and down and then if you open it, it comes up kinda like that, is that the way it was? Roger Thomas answered: That's right, sir, so when I shot in there I heard something hit the floor, so when I ... I of course, looked in, I saw the man, he had hit the floor from standing side of the door where I had poked the gun through at. I asked the question: Did you shoot through a screen, or was there a screen there, or do you know? Roger Thomas answered: I think it was a screen on the inside of the windows. I asked the question: How did you get inside? Roger Thomas answered: Well, I told the woman to open the door then. I asked the question: Did she? Roger Thomas answered: Yes, sir. And, I asked the question: Then what did ya'll do or what did you do? Roger Thomas answered: Well, I checked. Pearline went on and I told her to check the bedroom out for money or whatever she could find, and I checked the man out to see was he dead and all. I asked the question: Was he? Roger Thomas answered: Yes, sir. So, I took a coat and covered his head up and I told the woman to just turn around and watch television, and I advised her that we wasn't going to shoot her or anything if she just cooperated and all. She said she would. She begged us not to shoot her. I just told her she didn't have to worry about that, you know. Then, I asked the question: Did you have any kind of mask or anything on? Roger Thomas answered: I had a stocking on. I asked the question: Ladies type stocking pulled down all the way over your face? Roger Scott Thomas answered: Yes, sir. I asked the question: How was Earline dressed? Roger Thomas answered: She had on a blue winter, one of those ... I asked the question: Toboggan type cap; knit. Would it cover her face? Roger Thomas answered: Yes, sir, I think it would go all the way down to her chin at least. I asked the question: Did she have anything she could see out ... her eyes open? Roger Thomas answered: She had the holes cut in it. I asked the question: What did you get out of the trailer? Roger Thomas answered: We got some shotgun shells and a shotgun that was in the men's bedroom, and we got a watch, I believe. I think it was just one watch. I asked the question: Ladies watch? Roger Thomas answered: Yes. Yes, sir. I asked the question: What kind of shotgun was it? Roger Thomas answered: It was a .12 gauge pump. I asked the question: What did you do with that? Roger Thomas answered: I had it up there in Thomas answered: I had it up there in Missouri at my brother's house, Kansas City, Missouri. That's where I left it at. I asked the question: At Jessie's house? Roger Thomas answered: Yes, sir. I asked the question: Do you remember what make or brand it was? Roger Thomas answered: No, sir. I asked the question: Now, the watch. What happened to that? Roger Thomas answered: I left it with Pearline. She had it. I asked the question: Do you *1163 recall the other day when we came back from Florida, before we ever left down there, I advised you of your rights at that time. Roger Thomas answered: Yes, sir. I asked the question: And, you understood them, didn't you? Roger Thomas answered: Yes, sir. I asked the question: Do you recall showing ... do you recall me showing you a watch during this trip back: a ladies watch? Roger Thomas answered: Yes, sir. I asked the question: Did that look like the one, in your judgment, or do you have an opinion at all? Roger Thomas answered: That looks exactly like the one. I asked the question: Okay. Now, did you get a bill ... billfold from either the man or the woman, or anything, that night? Roger Thomas answered: I got a wallet out of his pocket. I asked the question: Okay. What did you do with that? Roger Thomas answered: I believe we threw it out the window, I guess, or somewhere. I believe it was on the dirt road there ... we threw it out the window after getting out the few bills that was in it. I asked the question: How much money did you actually get? Do you recall? Roger Thomas answered: I believe it was about $16.00. I asked the question: That was out of the man's billfold? Roger Thomas answered: Pearline fount about ... I think she fount a $10 bill under the mattress, and I believe she had $6 in the wallet. I asked the question: Okay, and you threw this billfold out somewhere after you left there? Roger Thomas answered: Yes, sir. I asked the question: Now, did you ever pull anything over the woman's head, or her at all, in that house? Roger Thomas answered: I told her to lay down on the couch. I covered her with a blanket; covered her head up with a blanket before we left. I asked the question: Did Earline ever say anything there that night? Do you recall? Roger Thomas answered: She didn't actually say anything; but, of course, you know, not where she could be heard, but she was motioning to me. I asked the question: I see, but what was spoken and said as far as being directed at the man or the woman; and the woman after the man had been shot, you did all of that, is that correct? Roger Scott answered: Yes, sir. I asked the question: I mean as far as the major talking between you and the victim, or the woman that was there? Roger Scott answered: That's right. I asked the question: What caused you to go to the house to start with? Why did you go there looking for money? Did you have somebody tell you something, or think something, or what? Roger Scott answered: Well, someone had told Pearline about the man was suppose to have a lot of money; Pearline had told me about it later on after she was told and she said it in such a way to me, you know, for me to understand that she wanted me to know ... go out there and try something. I asked the question: Help her with it? Roger Scott Thomas answered: Yes, sir. So, we agreed together since I knew that's what she was wanting to, you know, and I needed money myself too. I asked the question: She knew that at that time, didn't she? Roger Scott answered: Yes, sir. I asked the question: The shotgun that you used; where did you get that? Roger Scott Thomas answered: I believe on 17, run through York crossing the bridge right out of town. I asked the question: What did you get, or when did you get that gun? Roger Thomas answered: I guess about 3 or 4 weeks earlier. I asked the question: Did you cut the barrel off? Roger Thomas answered: Yes, sir. Sheriff Stephens asked a question: Was that in York? Roger Thomas answered: I think it was more or like down in Choctaw County. I don't know. It's right across that bridge. I forget the name of that creek. I asked the question: Alamuchee Creek? Roger Thomas answered: You know, it's the first creek going south toward 80, right out of York. I asked the question: Was it a single barrel shotgun? Roger Thomas answered: Yes, sir. I asked the question: What did you do with it? Do you know? Roger Thomas answered: Let me see. I don't know just what became of that gun. I asked the question: Did you cut the barrel off? Roger Scott answered: Yes, sir. I asked the question: Did you cut the hand stock off *1164 too? Roger Thomas answered: Yes, sir. You don't remember what you had done with that gun? Roger Thomas answered: No, sir. I asked the question: Is there anything else about that robbery over there that you want to tell me or ask me, Roger? Roger Thomas answered: Not as I know of so far. Sheriff Stephens asked a question: Can you describe the subject. I asked a question: The man that was shot. Sheriff Stephens: The man that was shot ... yourself ... didn't you see him; can you describe him? Roger Thomas answered: Well, I saw him after we got in the trailer, yes, sir. I asked the question: White man or black man? Roger Thomas: I reckon he was mixed. I asked the question: Light skin? Roger Thomas answered: He was pretty light skinned. I asked the question: Young man or old man? Roger Thomas answered: He was an older fellow. I asked the question: How was he dressed? Do you recall? Roger Thomas answered: In some work pants. I can't describe what kind of shirt it was. I asked the question: What part of the body did the shotgun load hit him in? Roger Thomas: In the stomach section. I asked the question: Now, what kind of shots did you have in there? Roger Thomas answered: .12 gauge, I believe. I asked the question: Do you know what kind of shot: .6 or .8, buckshot, or what? Roger Thomas answered: No, sir. Sheriff Stephens asked the question: How was the weather that night? Do you remember? Roger Thomas answered: It was raining. I asked the question: Rainy weather. Anything else you want to ask me or tell me about it? Roger Thomas: No, sir, I guess I had better not. Roger Scott Thomas laughed. Then I asked the question: What do you mean by that? Roger Scott Thomas answered: Always wished the old woman well. The old woman that was there, you know. I don't know how she felt about it afterwards, but I imagine pretty bad. I kinda regretted after all, me having to carelessly poke the thing up through the screen there, which first thing when I went there, I thought many times after that, I should have used the .22, but heck, I don't know, I would have probably got my own brains blown out, but come to find out he did have enough up in there to do so. I asked the question: Did he ever threaten you with a gun the night before? The first night that you went there, Roger. Roger Thomas answered: No, sir. I asked the question: He didn't? You never saw him with a gun? Roger Thomas answered: No, sir. Sheriff Stephens asked the question: Where did you say you left that gun? Roger Thomas answered: Up in Missouri with my brother at his house: Jessie. Sheriff Stephens: The one that's up here now. Roger Thomas: Yes, sir, I guess he's here. Myself answered: He's here. Sheriff Stephens asked the question: Do you have any idea where it is now; that gun? Roger Thomas answered: I don't know. He ought to know where it is ... where it's at `cause I left there at the house. Sheriff Stephens asked the question: I'd like to get the gun back and give the gun to his son. He gave the gun to his son. I'd like to get it back. I asked the question: But, you don't ... you left it with him and when you were arrested, you don't know what he did with it. Roger Thomas answered: I had it in my property; all my property. I usually kept all my stuff together there at my house.
Q Now, Mr. Billingsley, did you have a later conversation with Roger Scott Thomas, after this conversation, regarding the shotgun?
A I did.
Q When was that and where was that?
A The statement was taken on Sunday night, November 20, on Tuesday, the following Tuesday, November 22, 1977, I talked with Roger Scott Thomas.
Q Did you again advise him of his rights?
A I did.
Q The same rights that you testified that you advised him to on November 20?
A I did.
Q Did he understand those rights?
A He did.
Q Where was he at that time? *1165 A Sumter County Jail, Livingston, Alabama.
Q Who was present?
A Myself and Sheriff Melvin Stephens.
Q Did he make a statement regarding the shotgun?
A He did.
Q What did he tell you?
MR. BOGGS: I object to this, Your Honor, this new statement. It's the first I've heard about it. There's nothing in here about it. And, at this point, I say that there's not enough ground work laid, nor enough predicate laid to show it was a voluntary statement and that he was properly advised of his rights, and we object.
THE COURT: Let's take the jury out. Mr. Shaw will you take the jury back to the juryroom while I take this matter up.
(Whereupon, the bailiff took the jury back to the juryroom, and the following was taken up outside the presence of the jury.)
Q MR. WATKINS: (continuing): What rights did you advise

APPENDIX B
between myself and the District Attorney and with concurrence of the court, at this point I would like to play a portion of the tape for the jury.
(Whereupon, the following portion was played for the jury)
EDD BILLINGSLEY: What had you gone there the night before for? What was the purpose of going there?
ROGER SCOTT THOMAS: Well we was intending to rob the man the first night there but we couldn't get him out of the house and that first night we didn't want to have to do no shooting up in the house, but our main purpose was to get the robbery done and so after he didn't come out of the house that first night it seemed to us that the only way we was going to get up in there was by shooting up in there and demanding...
EDD BILLINGSLEY: Forcing your way in?
ROGER SCOTT THOMAS: Yes, sir, and so the second night we went there and uh I started to put the same questions to him about ...
EDD BILLINGSLEY: What was some of these questions, please, sir?
ROGER SCOTT THOMAS: Well like uh we had car trouble down the road with our car and we wanted to use the telephone to get a service truck out there and those shoes, I don't know where that come in at. (Roger Scott Thomas laughs)
EDD BILLINGSLEY: You didn't ask about any shoes or didn't try to sell him, tell him you had some shoes you wanted to sell?
ROGER SCOTT THOMAS: No, we didn't mention anything about shoes.
EDD BILLINGSLEY: Was Earline up at the house with you?
ROGER SCOTT THOMAS: Well uh she was around the side of the house at the time.
EDD BILLINGSLEY: Who came to the door on the Sunday night?
ROGER SCOTT THOMAS: Well, it was a woman come to the door at the first but she didn't answer you know, she just ... when she saw me outside she backed up from the door.
EDD BILLINGSLEY: Was there a television on or were they up or were they in bed or do you know?
ROGER SCOTT THOMAS: There was a television on. I don't know whether they were in bed or not except this woman she was at the door. When she backed up she said something to the man that was in the house with her you know and that's when I put the gun through the door and I shot inside and I guess he was standing or had come out of the bedroom at the time see cause the bedroom is really not far from the door.
EDD BILLINGSLEY: Now when you shot you say you put it through the door. Describe that for me, how you did that. Was there a hole in the door or window there or what?
*1166 ROGER SCOTT THOMAS: There was a roll in, sort of a roll in type ...
EDD BILLINGSLEY: A louver where you can open them up or close, like my hand is straight up and down and then if you open it it comes up kind of like that. Is that the way it was?
ROGER SCOTT THOMAS: That's right sir. So when I shot in there I heard something hit the floor so when I of course looked in I saw the man he had hit the floor from standing side of the door where I had poked the gun through at.
(Whereupon, that portion of the tape, to be played to the jury, was concluded.)
 APPENDIX C
STATE OF ALABAMA, § IN THE CIRCUIT COURT OF
 Plaintiff, §
 SUMTER COUNTY, ALABAMA
VS. §
ROGER SCOTT THOMAS, §
 Defendant. § CASE NO. CC-78-02

ORDER OF THE COURT
After reviewing the evidence from the trial and the sentence hearing, and having weighed the circumstances, whether aggravating or mitigating, the Court fails to find sufficient reason to refuse to accept the death penalty as fixed by the jury. The Court finds that the following aggravating circumstances enumerated in Section 13-11-6 were present in this crime:
1. Capital felony was committed by a person under sentence of imprisonment.
2. The defendant was previously convicted of another felony involving the use or threat of violence to the person.
3. Capital felony was committed while the defendant was engaged in committing a robbery.
4. Capital felony was committed for pecuniary gain.
5. Capital felony was especially heinous, atrocious, and cruel.
The Court further finds that none of the mitigating circumstances set out in Title 13-11-7 were present. Therefore, the Court accordingly sentences the Defendant, Roger Scott Thomas, to death by electrocution, and it is the order and judgment of the Court that the Defendant, Roger Scott Thomas be executed as provided by law on the 21st day of July, 1978. It is further ordered that this sentence be suspended pending the automatic appeal required by law. It is further ordered that an appeal to the Court of Criminal Appeals of Alabama be entered as required by law. It is further ordered that the Defendant, Roger Scott Thomas, remain in custody during the pendency of the appeal, and that the Sheriff of Sumter County, Alabama, forthwith transport the defendant to Holman Penitentiary and there deliver him to the custody of the Warden of Holman Penitentiary.
DONE and ORDERED, this the 20th day of June 1978.
 s/ Claud D. Neilson
 Circuit Judge
NOTES
[1] This court specifically rejects aggravating circumstance four in Appendix C. See Cook v. State, 369 So.2d 1251 (Ala. 1979).
[2] We express grave doubt as to the applicability of aggravating circumstance five, Appendix C, to the facts of this case. See Jacobs v. State, 361 So.2d 607, which adopts State v. Dixon (Fla.), 283 So.2d 1, defining this language.